CHARLES R. STUBBLEFIELD AND HELEN J. STUBBLEFIELD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stubblefield v. Commissioner
Docket No. 36626-84.
United States Tax Court
T.C. Memo 1988-480; 1988 Tax Ct. Memo LEXIS 509; 56 T.C.M. (CCH) 405; T.C.M. (RIA) 88480; October 3, 1988. J.W. Tyner, for the petitioner. A. Shawn Noonan and Gary D. Kallevang, for the respondent. GOFFE
MEMORANDUM *510 FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income taxes for the taxable years 1980 and 1981 as follows: Taxable Year
Deficiency
1980
$ 27,916.61
1981
27,853.61
After concessions, [1] the sole issue for consideration is whether petitioner's quarter horse activity was an "activity not engaged in for profit" within the meaning of section 183. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated by this reference. Petitioners Charles R. and Helen J. Stubblefield, husband and wife, resided in Tyler, Texas, at the time they filed their petition. Petitioners filed joint Federal income tax *511 returns for the calendar years 1980 and 1981. [3]
From 1955 to approximately December 1985, petitioner's primary occupation was a broker of oil and gas leases. From approximately 1970 to 1975 petitioner rode and showed horses competitively and for pleasure. Although petitioner terminated riding and showing competitively in 1975 or 1976, he continues to ride horses for pleasure. His knowledge and activity in the quarter horse business allowed him to become recognized in 1970 by the American Quarter Horse Association ("AQHA") as qualified to judge horses shown at AQHA events. From 1970 to the present, petitioner has traveled to horse shows held in numerous states to act as a judge at those events. Petitioners' son, Scott Stubblefield, has also acquired an expertise in horse showing and riding. Scott Stubblefield first became involved with horses at age 5, with strong encouragement from his parents. By age 15, he was already training and winning professional *512 in the quarter horse field. In 1975, Scott was 22 years old. With petitioner's and his son's expertise in the quarter horse field, petitioner desired to develop a prominent quarter horse operation in which other horse owners could bring their horses to be trained, shown, and sold. Projections were made by petitioner and his wife and "friends in the horse business" as to fees and profits to be made but no formal written business plan was ever undertaken. Petitioner and his wife and friends would have informal conversations regarding the plans for the future quarter horse operations. While petitioner was judging horses or traveling on oil and gas business in various parts of the country, he visited other horse facilities to get ideas and consult with those operators regarding the type of facility he desired to build. Petitioner also consulted with his banker, other quarter horse experts in the Tyler, Texas, area, his attorney, and his accountant in planning his quarter horse operations. In an attempt to establish a quarter horse activity that would be nationally regarded, petitioner, in January 1975, purchased a 17-acre tract of land 5 miles southwest of Tyler, Texas, for *513 $ 60,000. Petitioner conducted his activity under the name "Stubblefield Farm" (sometimes hereinafter referred to as the Farm). Mr. James Godwin, the previous owner utilized the property for his wholesale milk business. At the time of the purchase, the improvements on the land consisted of a cinder block building, a small tin barn, and some rough fencing. The tin barn had four chicken coop-type stalls in which Mr. Godwin had a few grade horses. In 1975, a small apartment was completed on the 17 acres. In 1979, a 2,400-square foot residence on the land was completed. In addition, in 1980 petitioner began construction of a large show barn for use in showing horses. The total cost of the land and improvements were $ 220,000 to $ 240,000 which petitioner financed by cash down payments and loans from the Federal Land Bank. Petitioner's son, Scott and Scott's wife resided in the residence on the Stubblefield Farm rent free. While living on Stubblefield Farm, Scott and his wife handled the day-to-day affairs and management of the ranch. Scott was designated as the trainer of Stubblefield Farm. He never received a salary nor did petitioner reflect Scott as an employee in his income *514 tax return or for withholding purposes. Petitioner's involvement in the Farm was limited to weekly or monthly reviews of invoices and expenses associated with the quarter horse activity, as well as occupation of the Farm when his son was away. Records of the Stubblefield Farm's operations were not maintained. No records were produced at trial. Petitioner did produce cancelled checks and receipts supporting his Schedule F deductions. On Schedule F, Farm Income and Expenses, attached to petitioners' joint Federal income tax returns for taxable years 1976 through 1983, petitioner claimed the following income, expenses, and losses with respect to the quarter horse activity: Taxable
Year
Income
Expenses
Net Loss
1976
$     0.00
$ 20,089.16
(20,089.16)
1977
30.00
20,774.53
(20,744.53)
1978
1,759.86
10,349.48
( 8,589.62)
1979
0.00
30,444.95
(30,444.95)
1980
1,262.90
20,479.69
(19,216.79)
1981
6,605.82
60,052.83
(53,447.01)
1982
0.00
35,815.00
(35,815.00)
1983
5,783.06
26,489.25
(20,706.19)
Despite continuing losses, petitioner did not consult *515 with other experts or horse operators regarding the restructuring of his operations so as to make them profitable. Petitioner never consulted with his son, nor did he ask Scott to alter operations so as to increase profitability. The sources of income from the quarter horse activity reported by petitioner on Schedule F attached to petitioners' joint Federal income tax returns for taxable years 1976 through 1983 are as follows: Year
Judging Fees
Sale of Horses
Sale of Hay
1976
--
--
--
1977
--
--
$ 30.00
1978
$   617.00
$ 1,142.86
--
1979
--
--
--
1980
1,262.90
--
--
1981
2,105.82
4.500.00
--
1982
--
--
--
1983
1,823.06
3,960.00
--
Petitioners' adjusted gross income for the years 1978 through 1983 is as follows: Adjusted Gross
Year
Income Reported [4]
1978
$  72,655.46
1979
41,174.98
1980
65,648.86
1981
280,198.58
1982
180,773.00
1983
319,075.19
*516 Petitioner paid all of the expenses of the quarter horse activity on Stubblefield Farm while it operated, but did not receive any of the income from breeding fees, training fees, and prize money. During the operation of petitioner's quarter horse activity, his son generated income from training, boarding, and breeding, in addition to prize money. In 1978, a horse owned by Scott Stubblefield and Ray Todd named Certain Success won a $ 20,000 purse at a 2-year old pleasure futurity. Certain Success also earned breeding fees at a rate of $ 750 until his death in 1980. At the time of his death Certain Success was valued at $ 50,000. Subsequent to the death of Certain Success petitioner owned a one-half interest in a brood mare acquired for $ 900 and a quarter horse acquired for $ 2,000. In 1981 petitioner sold a quarter horse to his son for $ 4,500. Scott later sold that same horse for $ 6,500 to a third party. In addition to Scott's day-to-day management of Stubblefield Farm and ownership of the most profitable horse on the Farm, advertisements and articles in quarter horse trade periodicals promoting the Farm did not associate petitioner with the Farm in any way. Petitioner's *517 name is not mentioned in any advertisement. Nor is petitioner's name mentioned as a co-owner of Certain Success in these articles. Listed as co-owners in all articles or photographs of Certain Success are Scott Stubblefield and Ray Todd. In 1985, the oil and gas business in Texas declined and petitioner abandoned this line of work in December 1985. Petitioner's abandonment of the quarter horse activity was at approximately the same time. Due to the location of the Farm, its value had appreciated without regard to the quarter horse activity conducted on it. The Farm was put up for sale in 1985. At the time of trial, petitioner had a contingent sales contract to sell Stubblefield Farm for $ 500,000. In the statutory notice of deficiency, the Commissioner determined that petitioner's quarter horse activity was not engaged in for profit within the meaning of section 183. The Commissioner disallowed deductions attributable to the activity to the extent they exceeded income generated from the activity. OPINION The sole question presented is whether the quarter horse activity entered in by Charles R. Stubblefield was an "activity not engaged in for profit" within the meaning *518 of section 183. Section 183(c) provides: (c) Activity Not Engaged in for Profit Defined. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.
Petitioners bear the burden of proving the expenses are deductible under sections 162 or 212. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). The essential test to be applied is whether petitioner possessed an actual and honest profit objective. Sec. 1.182-2(a), Income Tax Regs.; Dreicer v. Commissioner,78 T.C. 642, 643 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Whether this profit objective exists must be determined by looking to all the surrounding *519 facts and circumstances. Sec. 1.183-2(a), Income Tax Reg.; Finoli v. Commissioner,86 T.C. 697, 722 (1986); Beck v. Commissioner,85 T.C. 557, 570 (1985). Greater weight must be given to objective factors than to petitioner's statement of intent. Sec. 1.183-2(a), Income Tax Regs.; Beck v. Commissioner, supra;Engdahl v. Commissioner, supra at 666. Section 1.183-2(b), Income Tax Regs., provides a list of factors to be used in determining the existence of a taxpayer's profit objective. These factors are: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; *520 (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.
The list is intended to provide objective standards based upon prior case law. No one factor is determinative. Sec. 1.183-2(b), Income Tax Reg.; Abramson v. Commissioner,86 T.C. 360, 371 (1986). Based upon the record before us as applied to these factors, we find that petitioners' quarter horse activity was an "activity not engaged in for profit" within the meaning of section 183. Petitioner contends that his quarter horse activity was conducted in a business-like manner thereby establishing an intent to profit. Petitioner contends that (1) he purchased a 17-acre tract of land outside of Tyler, Texas, with an intent to establish a prominent quarter horse operation; (2) separate books and records of the quarter horse activity were maintained; (3) he investigated other quarter horse businesses and consulted experts prior to the purchase of Stubblefield Farm. When petitioner purchased the 17-acre tract of land, it was not equipped at that time to be *521 an operating quarter horse operation. Yet in spite of this, petitioner constructed a small apartment and then a 2,400-square foot residence. It was not until 1980, 5 years subsequent to the purchase of the land, that a show barn was built. Instead of building a basic facility in which to breed, train, and sell horses after purchasing the land, petitioner constructed a residence in which his son lived in rent free. The use to which Stubblefield Farm was put after purchase appears to be for a recreational or personal use rather than business. [5]
Petitioner failed to maintain books and records of the quarter horse activity. Although petitioner testified, on direct examination, that separate books, records and a bank account existed, he never offered evidence of any kind to prove such. The revenue agent who audited petitioners' 1980 and *522 1981 joint Federal income tax returns testified that she received cancelled checks and receipts to substantiate petitioner's Schedule F deductions. However, she did not receive books, ledgers, financial statements, or any other financial summaries regarding the quarter horse activity. In addition, there was no evidence of quarter horse records reflecting costs, fees earned, and breeding summaries. Petitioner testified that his wife set up records regarding incoming, outgoing, and presently maintained horses and in addition observed the checks and bills that were paid. Due to petitioners' failure to produce these records, we find petitioner's wife's involvement negligible. Clearly, if petitioner contends the books and records do exist, the best evidence of the existence and contents of these items are the books and records themselves. Since petitioners bear the burden of proof and have failed to produce documentary evidence essential to a finding in their favor, we must assume that such evidence, if offered by petitioners, would have been unfavorable. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), *523 affd. 162 F.2d 513 (10th Cir. 1947). Although petitioner consulted with financial, legal, and quarter horse experts regarding the implementation of Stubblefield Farm, and was able to investigate many quarter horse operations in his travels while judging at horse shows, the history of losses bears witness to the fact that he did not follow the advice of these experts. The record is devoid of any evidence of petitioner's consulting experts in other quarter horse operations during this period of continued losses in an attempt to operate his quarter horse activity profitably. Petitioner never consulted his trainer and day-to-day manager, Scott, about varying the operating procedures. Thus, even though substantial preliminary investigation was made of other quarter horse operations, petitioner's failure to attempt to improve profitability during the period of loss clearly demonstrates lack of conduct in a business-like manner. Petitioner and his son possessed adequate expertise in training and showing horses. What knowledge and information petitioner lacked in operating a quarter horse activity was acquired by his study of and inquiry into the operation of other *524 quarter horse businesses. Had petitioner conducted his quarter horse activity in accordance with such expertise and knowledge, a profit objective may be found to exist. However, in the face of mounting losses from 1976 to 1983 from such operations, petitioner did not seek assistance from experts in the field nor did he attempt to undertake any changes to minimize losses or improve profitability. Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). Complacency with continued losses weighs against finding a profit objective. Petitioner testified on direct examination that he spent an average of 30 hours a week at Stubblefield Farm in connection with the quarter horse activity. However, petitioner also testified on cross examination that there were weeks during which he did not go to the Farm at all. In addition, petitioner testified that his involvement in the quarter horse activity was limited to receiving invoices on a weekly or monthly basis and meeting with his son monthly *525 to discuss the Farm's operations. Petitioner's only other involvement in the quarter horse activity was his residing at the Farm when Scott and his wife were away. Based upon this testimony, and all objective evidence, as well as the lack of any documentary evidence, the Court finds that petitioner's involvement in the quarter horse activity was limited to monthly meetings, reviewing operations on a monthly or weekly basis, and filling in during Scott's absence. It is important to note that even though petitioner discontinued riding, showing, and training horses on a competitive level, he testified that he still rode for pleasure. Petitioner's oil and gas leasing business provided substantial amounts of income in 1981 through 1984, enabling petitioner to ride and care for his horses at his leisure. Petitioner's recreational benefit in riding is a motivation as likely as profit seeking for the operation of a quarter horse activity. Thus, based on the fact that petitioner spent a minimal amount of time in connection with the quarter horse activity and the time spent at Stubblefield Farm was recreational, the Court is not persuaded that the amount of time spent by petitioner indicates *526 an intent to pursue profitability. Petitioner asserts that the time he spent in judging at AQHA events should be considered time attributable to the quarter horse activity. Petitioner contends that this time is analogous to time spent marketing and advertising in other businesses. We disagree. Petitioner has not brought forth either by documentary evidence or by testimony the number of trips he took in connection with judging, the contacts made, and the time spent actually advertising or promoting the quarter horse activity. Petitioner stated that in 1980 and 1981 he increased his judging activity and that he retained records reflecting this. However, without additional evidence, the Court will not accept these uncorroborated statements. Even if, as petitioner contends, he did judge at AQHA events more in 1980 and 1981, petitioner has failed to show the Court how this translates into an intent to improve profitability of the quarter horse activity. The Court is left with the question of what did petitioner do when he was marketing his quarter horse activity and what are the results at Stubblefield Farm relating to profitability from petitioner's efforts? Petitioner has failed *527 to put on adequate proof. Petitioner argues that a minimal time involvement does not necessarily indicate a lack of profit objective because he employed Scott as a competent and qualified trainer to handle the day-to-day affairs of the Farm. Sec. 1.183-2(b)(3), Income Tax Regs. We agree in that petitioner's son's primary occupation was a trainer at Stubblefield Farm. As Scott was competent and qualified to manage the day-to-day affairs of Stubblefield Farm, petitioner's minimal time involvement does not necessarily indicate a lack of profit objective. Petitioner next contends that because the total investment in Stubblefield Farm was $ 220,000 to $ 240,000 and a contingent contract for sale was procured for $ 500,000, an expectation of appreciation in an asset used in the activity is shown. We disagree. Although this Court takes notice of the fact that the land may have appreciated in value, this appreciation must be considered independently for the purpose of determining a profit objective with respect to the quarter horse activity. The appreciation of the property was due to its location and not the use to which it was put. Petitioner's choice *528 of this tract of land to purchase, given its location, lack of any facilities in which to conduct quarter horse operations, and subsequent construction of residential dwellings instead of quarter horse facilities, demonstrates that petitioner's objective was to realize the eventual appreciation from this property. Section 1.183-1(d)(1), Income Tax Regs., requires that the farming and holding of land for appreciation be considered separate activities with respect to ascertaining a profit objective when there is no net income from the farming activity to reduce the cost of holding the land. Estate of Power v. Commissioner,736 F.2d 826, (1st Cir. 1984), affg. a Memorandum Opinion of this Court. Petitioner operated his quarter horse activity for a loss in every year of operations. Petitioner failed to address this "separate activity" argument. Certain Success may also have represented an asset with expected appreciation. The value of the horse at death in 1980 was $ 50,000. Petitioner testified that, had Certain Success lived, he may have been *529 worth $ 100,000. However, there is no evidence whatsoever to demonstrate that this uncorroborated estimate is correct. In addition, there is no evidence to demonstrate that petitioner had any interest in Certain Success. Petitioner testified that he was unable to recall his investment or percentage ownership in Certain Success. All advertisements refer to Scott Stubblefield and Ray Todd as co-owners. In addition, petitioner's 1980 joint Federal income tax return makes no reference to Certain Success' death which would have provided a casualty loss. The Court is not persuaded that petitioner had any interest in Certain Success and therefore any appreciation of the horse's value would not be attributable to petitioner. Petitioner has not engaged in any similar quarter horse activities in the past. Sec. 1.183-2(b)(5), Income Tax Regs. Accordingly, this factor does not weigh either for or against petitioners' position. Petitioner sustained losses in each year he operated the quarter horse activity. Although losses in the initial years of an activity are *530 not necessarily fatal to the section 183 determination, the ultimate goal of an activity engaged in for profit must be to realize a net profit on the activity so as to recoup losses sustained previously. Bessenyey v. Commissioner,45 T.C. at 274. Petitioner testified that an informal partnership agreement existed between petitioner and his son. He testified that, in some cases there was an equal division of income and expenses. This testimony is not supported by the facts. The income reported by petitioner from 1976 to 1983 on Schedule F of his joint Federal income tax return was from judging fees, sales of horses, and sale of hay. None of the breeding fees, boarding fees, or any horse show revenues were reported as income to petitioner. Petitioners' son, Scott, received all of these as income. Although petitioner testified that there was an equal division between his son and himself, this testimony is not supported by the facts. In 1976, 1979, and 1982, there were no gross receipts from petitioner's quarter horse activity shown on Schedule F, and in 1977 gross receipts from the quarter horse activity were $ 30. Expenses for the years 1976, 1977, 1979, and *531 1982 were $ 20,089.16, $ 20,774.53, $ 30,444.95, and $ 35,815, respectively. From 1976 to 1983 petitioner had gross income from his quarter horse activity of $ 15,441.64, as opposed to losses of $ 209,053.25. The facts support a finding that petitioner purchased the 17-acre tract and made improvements with his own funds, paid all of the expenses of operating Stubblefield Farm and received little if any of the Farm's income. This deliberate diversion of income is clearly not a demonstration of a business operating for profit when the objective evidence is viewed as a whole from 1976 to 1983. Had the informal partnership plan been implemented allowing an equal division of the income, petitioner would have shown a profit in 1978, the year in which Certain Success won the $ 20,000 purse. In addition, petitioner sold a horse to Scott for $ 4,500 in 1981, which horse Scott sold shortly thereafter to a third party for $ 6,500. Petitioner's operation of his quarter horse activity at a loss and failure to take any remedial action in light of the continued losses as well as the retention by his son of the operating income indicate that the quarter horse activity was not engaged in for *532 profit. Petitioner contends that these operating losses are typical of a start-up quarter horse activity. In addition he argues that due to circumstances beyond his control, the losses were unavoidable. These uncontrollable circumstances include an economic downturn of the oil and gas business in Texas and the death of Certain Success. the presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years. [Bessenyey v. Commissioner,45 T.C. at 274.] Petitioner testified to his expectations of future profitability but only in general terms and with no formal business plan. Given petitioner's uncertainty of future business projections and protracted period of losses, it is clear that *533 petitioner lacked a profit objective. Moreover, these losses did not result from unforeseen or fortuitous circumstances beyond petitioner's control. Cf. Engdahl v. Commissioner, supra. They resulted from a failure to conduct the quarter horse activity with an objective to profit. Bessenyey v. Commissioner,45 T.C. at 275. With respect to the downturn in the oil and gas business, petitioner can demonstrate no causal relationship between this economic factor and petitioner's consistent losses in his quarter horse activity. In 1981, petitioner had the most profitable year in the oil and gas business and other sources of income ($ 280,198.58). However, in that same year, petitioner suffered his largest loss in the quarter horse activity ($ 53,447.01). Regardless of the condition of the Texas economy, petitioner was not going to realize a profit because Scott was receiving all of the revenues and petitioner was paying all of the expenses. The only correlation between petitioner's oil and gas business and his quarter horse activity was that, when the former experienced financial difficulties, petitioner was no longer able to subsidize the latter. *534 The death of Certain Success cannot be causally linked to the continued losses in petitioner's quarter horse activity. First, in 1980, the year of Certain Success' death, the net loss from quarter horse operations was smaller as compared to 1979, the year in which Certain Success began campaigning. [6] In addition, petitioner made no effort to improve profitability by replacing Certain Success with another prominent quarter horse. Rather, in 1981, petitioner owned a one-half interest in two inexpensive horses. Finally, even if petitioner is correct in his assertion that Certain Success' death resulted in future losses, there must have been an abrupt absence of revenues from Certain Success in breeding and showing activities. However, the breeding and showing revenues from Certain Success were never received by petitioner, even before Certain Success' death. Therefore, if petitioner never had received any income from this horse's activities, the absence of Certain Success and his breeding fees and prize money did not affect overall profitability in petitioner's quarter horse activity. At the very least, it minimized expenses of feeding, training, and showing. *535 The regulations provide that a profit objective may exist when there is an occasional profit from an activity. Sec. 1.183-2(b)(7), Income Tax Regs. This is not the case here, for petitioner sustained losses in every year of operating his quarter horse activity. Petitioner contends however, that due to the highly speculative nature of the operation of a quarter horse activity, a profit objective does exist because there is an opportunity to earn a substantial ultimate profit. Sec. 1.183-2(b)(7), Income Tax Regs.
Petitioner argues that this opportunity existed in the form of the horse Certain Success, whose breeding fees, had he lived, would have generated significant income. At his death in 1980, Certain Success commanded a $ 750 breeding fee. Petitioner contends subsequent trends in breeding fees would have provided a fee of as high as $ 10,000 if Certain Success had lived. Petitioner's argument fails to persuade the Court for two reasons. First, regardless of how high a fee Certain Success could have received, petitioner had never *536 received any of the breeding fees or prize money from this horse. Although petitioner claims the existence of a partnership with his son, we decline to find its existence. Secondly, petitioner had no interest in Certain Success. Thus, petitioner's opportunity for ultimate profit has failed to materialize. In addition, as we have pointed out, in 1980 and 1981, the years following Certain Success' death, petitioner owned a one-half interest in two inexpensive and unproductive horses. Contrary to his testimony, petitioner made little effort to obtain ultimate profitability by seeking additional prominent quarter horses. Petitioner have failed in their burden of proof with respect to the factor set forth in the regulations of substantial income from other operations. Sec. 1.183-2(b)(8), Income Tax Regs. Petitioners did not brief nor respond on reply brief with any authority regarding this factor. However, the Court will note here that it is of great import that petitioner was financially able to pursue an expensive form of recreation for his son and himself. For the taxable years in controversy petitioner's income from his oil and gas leasing business *537 was more than adequate to fund this activity. The Court is not persuaded that the failure of the quarter horse activity at the time of the failure of the oil and gas leasing business was mere coincidence. The evidence of petitioner's recreational pleasure from this activity is demonstrated on the record. Petitioner and his son were avid horsemen. Although a retired horseman, petitioner still rode for pleasure. Petitioner took great pride in his son's achievement and of the fact that his son trained and showed a nationally regarded quarter horse, Certain Success. Petitioner argues that, in addition to the nine enumerated factors, the scale or size of Stubblefield Farm is an additional factor which demonstrates an intent to profit. Petitioner cites a Memorandum Opinion of this Court in which we held such a factor relevant to the analysis of whether an activity is engaged in for profit. Although such a factor is a relevant inquiry, petitioner has failed to produce evidence of the scale of operations at Stubblefield Farm. Petitioner has failed to produce an inventory of horses purchased, sold, shown, trained, or bred. It is our opinion that the scale of operations is dependent *538 not only upon the size of the farm and intent of the taxapayer, but upon other additional factors as well, some of which we have set forth above. Upon review of the entire record, we conclude that petitioner did not have an actual and honest objective of realizing a profit from his quarter horse activity in 1980 and 1981. Petitioner's quarter horse activity was an "activity not engaged in for profit" within the meaning of section 183. Accordingly, petitioner's deduction and expenses properly attributable to the activity are limited under section 183(b). Decision will be entered for the respondent.
Footnotes
1. Petitioners have conceded the adjustments for "unearned income" and "partnership income" in the amounts of $ 969.09 and $ 37,947.32, respectively, for the taxable year 1980. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the relevant years, and Rule references are to the Rules of Practice and Procedure of this Court. ↩
3. Hereinafter, petitioner in the singular will refer to Charles R. Stubblefield. Petitioner Charles R. Stubblefield is listed as sole proprietor on Schedule F, Farm Income and Expenses, for taxable years 1980 and 1981. ↩
4. The parties have stipulated these amounts to be adjusted gross income. Upon review of petitioners' 1980 and 1981 Federal income tax returns, the correct heading for these amounts should be "gross income." ↩
5. The purchase of land with substantial recreational or personal improvements on it is a factor indicating the horsebreeding facility is a hobby and not a bona fide business venture. Feldman v. Commissioner,T.C. Memo. 1986-287↩. 6. Campaigning is the process by which a horse acquires so many points during a period of time so as to qualify for the World Show. ↩